**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MOLL INDUSTRIES, INC. | ) | Case No. 10-11371  (MFW) |
| et al., | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF MOLL | ) | |
| INDUSTRIES, INC., et al. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 10-53291  (MFW) |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT | ) | |
| L.P., HIGHLAND LEGACY LTD., | ) | |
| HIGHLAND LOAN FUNDING V LTD., | ) | |
| LONGHORN CREDIT FUNDING LLC, | ) | |
| PAM CAPITAL FUNDING, LP, | ) | |
| PAMCO CAYMAN LTD., | ) | |
| RESTORATION FUNDING CLO, LTD, | ) | |
| HIGHLAND CRUSADER OFFSHORE | ) | |
| PARTNERS, NEXBANK, SSB, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**[1]

Before the Court are two motions to dismiss.  In their

motion to dismiss, the Secured Lenders contend that the Committee

has failed to present sufficient allegations to state a claim

that their claims should be recharacterized as equity or

equitably subordinated, or that their security interest on one of

---

[1]  The Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052(a)(3) of the Federal Rules of Bankruptcy Procedure.

the Debtors' bank accounts should be avoided.  For the reasons
stated below, the Court agrees and will grant the Secured
Lenders' motion to dismiss regarding the Committee's claims for
recharacterization or equitably subordination.  However, the
Court will deny the Secured Lenders' motion to dismiss regarding
the Committee's claim for avoidance of a security interest on one
of the Debtors' bank accounts.  In its motion to dismiss, HCMLP
contends that the Committee has failed to make sufficient
allegations to state an alter-ego claim.  For the reasons stated
below, the Court agrees and accordingly will grant HCMLP's motion
to dismiss.

I.   <u>BACKGROUND</u>

     Moll Industries, Inc. ("Moll") was a significant provider of
global injection molding and full-service contract manufacturing
solutions for the medical, appliance, industrial, consumer, and
automotive markets.

     Beginning in 2002, Highland Capital Management, L.P.
("HCMLP") acquired an interest in Moll's then-existing senior
credit facility.  Subsequently, HCMLP and other creditors of Moll
filed an involuntary petition under chapter 11 of the Bankruptcy
Code against Moll ("Moll I") in the United States Bankruptcy
Court for the Western District of Texas, San Antonio Division
(the "Texas Bankruptcy Court").  The case was converted to a

voluntary chapter 11 case, and Moll's plan of reorganization was confirmed on June 5, 2003.

Under the terms of the Moll I Plan, reorganized Moll received exit financing in the form of a Revolving Credit Facility of $15 million and a Term Loan of $32 million (the "Texas Exit Facility").  In addition, the holders of secured claims in a mezzanine term loan received a $24 million reorganized mezzanine term note (the "Reorganized Mezzanine Term Note") and 90% of the authorized reorganized Moll common stock. Both the Texas Exit Facility and the Reorganized Mezzanine Term Note (collectively the "Secured Loan Agreements") were held by a group of Secured Lenders[2] controlled by HCMLP.

Almost seven years later, Moll and its affiliates (collectively the "Debtors") filed voluntary petitions under chapter 11 in Delaware.  The United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") on May 10, 2010.

The Committee filed an adversary proceeding on October 15, 2010, which it amended on February 4, 2011 (the "Amended Complaint"), against the Secured Lenders and HCMLP.  In its

---

[2]  The "Secured Lenders" are Defendants NexBank, SSB ("NexBank"), Highland Legacy Ltd., Highland Loan Funding V Ltd., Longhorn Credit Funding, LLC, Pam Capital Funding, LP, Pamco Cayman Ltd., Restoration Funding CLO, Ltd., and Highland Crusader Offshore Partners, LP.  NexBank is the administrative agent on the Secured Loan Agreements.

Amended Complaint the Committee seeks to recharacterize the
Secured Lenders' claims as equity or in the alternative have them
equitably subordinated.  The Committee also seeks to avoid a
security interest held by the Secured Lenders in a bank account
of the Debtors.  Finally, the Amended Complaint asserts a claim
for alter ego liability against HCMLP.  The Secured Lenders and
HCMLP each filed a Motion to Dismiss the Amended Complaint for
failure to state a claim.  Both motions have been fully briefed
and are ripe for decision.


II.   <u>JURISDICTION</u>

This Court has core jurisdiction over this adversary
proceeding. 28 U.S.C. §§ 1334, 157(b)(2)(A), (B), (E), (K) & (O).


III. <u>DISCUSSION</u>

The Secured Lenders move for dismissal of the claims against
them under the doctrine of <u>res judicata</u> and under Rule 12(b)(6)
of the Federal Rules of Civil Procedure, made applicable to
adversary proceedings by Rule 7012(b) of the Federal Rules of
Bankruptcy Procedure.

As an initial matter, the Secured Lenders assert that the
Committee's Amended Complaint is untimely and improper.  Under
Rule 15(a) of the Federal Rules of Civil Procedure, a plaintiff
loses its right to file an amended complaint as a matter of

course twenty-one days after the filing of a motion to dismiss. Fed. R. Civ. P. 15(a). The Secured Lenders note that the Amended Complaint was filed forty-six days after the Secured Lenders filed their motion to dismiss and without leave of the Court. The Secured Lenders argue that an extension may not be given to file an amended complaint after the time has expired unless the party makes a motion showing failure to act because of excusable neglect. Fed R. Civ. P. 6(b)(1)(B).

The Committee responds that the parties entered into a stipulation extending the time within which the Committee could respond to the Secured Lenders' motion to dismiss "or otherwise plead." (D.I. # 26.) The Court finds that the Secured Lenders have waived any objection to untimeliness by entering into the extension stipulation after the time had expired. Fed. R. Civ. P. 15(a)(2) (a party may amend its pleading "with the opposing party's written consent").

A. Judicial Notice of the Moll I Confirmation Order

The Secured Lenders' res judicata argument is premised on the order of the Texas Bankruptcy Court confirming the Moll I Plan of Reorganization. As an initial matter, the Committee asserts that the Moll I Confirmation Order is not part of the record in this proceeding. The Secured Lenders respond that a court may properly consider pleadings and orders entered in other judicial proceedings in considering a Rule 12(b)(6) motion. See,

e.g., Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458
F.3d 244, 257 (3d Cir. 2006) (stating that "[t]o resolve a
12(b)(6) motion, a court may properly look at public records,
including judicial proceedings, in addition to the allegations in
the complaint.") (quotations omitted); In re Burlington Coat
Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A]
document integral to or explicitly relied upon in the complaint
may be considered without converting the motion [to dismiss] into
one for summary judgment.") (quotations omitted).

The Court finds that the Amended Complaint relies upon the
Confirmation Order and therefore may be considered part of the
record.  (Am. Compl. ¶ 61 (stating that in the Moll I
Confirmation Order "the Bankruptcy Court had found that the then-
existing financial arrangements, including the June 2003 Senior
Obligations, would ensure the viability of Moll Industries and
its subsidiaries.").)

B.   Res Judicata

The Secured Lenders argue that the Moll I Confirmation Order
has preclusive effect under the doctrine of res judicata on the
claims asserted by the Committee in the proceeding before the
Court.  A claim is barred under the doctrine of res judicata (or
claim preclusion) where (1) a prior proceeding resulted in a
final judgment on the merits, (2) the prior proceeding involved
the same parties or privies, and (3) the prior proceeding was

6

based on the same cause of action as the present case.  Sheridan
v. NGK Metals Corp., 609 F.3d 239, 260 (3d Cir. 2010).  The party
seeking to take advantage of claim preclusion has the burden of
establishing it.  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 158
(3d Cir. 2001).

The Court finds that the privity requirement under res
judicata is a threshold issue which makes it unnecessary to
examine whether there was a final judgment on the merits or
whether the prior ruling was based on the same cause of action.

The Secured Lenders assert that the present Committee is in
privity with the official committee of unsecured creditors that
was appointed in Moll I (the "Moll I Committee").[3]  Tahoe-Sierra
Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F.3d
1064, 1082 (9th Cir. 2003) (stating that under res judicata
federal courts can bind a non-party whose interests were
represented adequately by a party in the original suit).  As
evidence that the present Committee was adequately represented by
the Moll I Committee, the Defendants cite equitable subordination
claims asserted against the Secured Lenders by the Moll I

---

[3]  The Secured Lenders do not assert that the Committee is
in privity with Moll I as a representative of the Moll estate.
In fact, the Secured Lenders have opposed the Committee's motion
for standing to bring an alter ego claim against HCMLP on behalf
of the Moll estate.  The Committee's motion for standing is
currently pending.  Because the Court finds the Committee's
present alter ego claim against HCMLP is without merit, the
motion for standing will also be denied.

Committee and the fact that the Moll I Committee could have objected to the Plan of Reorganization.  All those issues were resolved by the Moll I Confirmation Order.

The Committee responds that it is not in privity with the Moll I Committee.  Initially, the Committee argues that whether the interests of one party were adequately represented by another so as to create privity is a factual question that cannot be determined on a motion to dismiss.  See, e.g., Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 221 (3d Cir. 2003) (interpreting Tennessee law and noting that "[p]rivity connotes an identity of interests and depends on the facts of each case.") (citations omitted); Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 410 (3d Cir. 1993) (noting "highly factual nature of privity analysis") (citing Johnson & Johnson v. Coopervision, Inc., 720 F. Supp. 1116, 1124 (D. Del. 1989)).

The Court finds that the issue of privity can be determined on the admitted facts and the law.  Any post-confirmation creditor is not bound by the Moll I plan.  See, e.g., Holywell Corp. v. Smith, 503 U.S. 47, 58-59 (1992) (holding that post-confirmation creditors are not bound by a confirmed plan).  See also 8 COLLIER ON BANKRUPTCY, ¶ 1141.02[1] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev.) ("A plan does not bind parties in interest with respect to post-confirmation claims against the debtor or the debtor's other relationships.").  The

8

Secured Lenders have failed to show that the current Committee, which was formed eight years after Moll I, represents only pre-confirmation Moll I creditors, who are bound by the Confirmation Order.  In fact, the unsecured creditors from Moll I received either an interest in avoidance actions, cash, or no distribution, depending on their class. (D.I. # 12 at Ex. 6.) None were given notes in reorganized Moll.  (Id.)  Therefore, the claims of the unsecured creditors of Moll I were effectively discharged by the Confirmation Order, eliminating the possibility that there could be privity between the Moll I Committee and the creditors represented by the current Committee.  11 U.S.C. § 1141(d)(1).[4]  In the absence of privity, the Court need not examine the remaining two elements and concludes that the doctrine of res judicata does not bar the Committee's claims.

   C.   Rule 12(b)(6) Dismissal

      1.   Standard of Review

   A Rule 12(b)(6) motion tests the sufficiency of the factual allegations in the Committee's complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim

---

[4]  Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of the plan -
     (A)  discharges the debtor from any debt that arose before the date of such confirmation . . . .
11 U.S.C. § 1141(d)(1).

or to permit inferences to be drawn that these elements exist.").
With the Supreme Court's recent decisions in <u>Bell Atlantic Corp.</u>
<u>v. Twombly</u>[5] and <u>Ashcroft v. Iqbal</u>,[6] "pleading standards have
seemingly shifted from simple notice pleading to a more
heightened form of pleading, requiring a plaintiff to plead more
than the possibility of relief to survive a motion to dismiss."
<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).

A claim is sufficient if it is facially plausible, that is
"when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable for
the misconduct alleged." <u>Iqbal</u>, 129 S. Ct. at 1949. Determining
whether a complaint is "facially plausible" is "a context-
specific task that requires the reviewing court to draw on its
judicial experience and common sense." <u>Id.</u> at 1950. "[W]here
the well-pleaded facts do not permit the court to infer more than
the mere possibility of misconduct, the complaint has alleged -
but not shown - that the pleader is entitled to relief." <u>Id.</u>

After <u>Iqbal</u>, the Third Circuit has instructed the courts to
"conduct a two part analysis. First the factual and legal
elements of a claim should be separated. The [court] must accept
all of the complaint's well-pleaded facts as true, but may
disregard any legal conclusions." <u>Fowler</u>, 578 F.3d at 210-11.

---

[5]   550 U.S. 544 (2007).

[6]   129 S. Ct. 1937 (2009).

See also Iqbal, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim."  Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.), Bankr. No. 03-12656, Adv. No. 08-50248, 2008 WL 4239120, at *4 (Bankr. D. Del. Sept. 16, 2008).

   2. Recharacterization

   Courts in this jurisdiction generally consider eleven factors in determining whether recharacterization is proper.  In re Exide Techs., Inc., 299 B.R. 732, 740 (Bankr. D. Del. 2003). These factors include:

(1) the names given to the instruments, if any, evidencing the indebtedness;
(2) the presence or absence of a fixed maturity date and schedule of payments;
(3) the presence or absence of a fixed rate of interest and interest payments;
(4) the source of repayments;
(5) the adequacy or inadequacy of capitalization;
(6) the identity of interest between the creditor and the stockholder;
(7) the security, if any, for the advances;
(8) the corporation's ability to obtain financing from outside lending institutions;
(9) the extent to which the advances were subordinated to the claims of outside creditors;
(10) the extent to which the advances were used to acquire capital assets; and
(11) the presence or absence of a sinking fund to provide repayments.

Id. (citing In re AutoStyle Plastics, Inc., 269 F.3d 726, 750-51 (6th Cir. 2001)).

The Third Circuit has rejected any mechanistic application of the factors, but they may still serve as guideposts to help the Court navigate the Committee's factual allegations.  In re SubMicron Sys. Corp., 432 F.3d 448, 455-56 (3d Cir. 2006). Courts must look to the facts on a case by case basis, focusing on the intent of the parties "inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the circumstances."  Id. at 456 (stating that the answers to the recharacterization question "lie in facts that confer context case by case.").  See also In re Radnor Holdings Corp., 353 B.R. 820, 838 (Bankr. D. Del. 2006) (stating that the court should not focus on any one particular factor, but apply a "common sense evaluation of the facts and circumstances surrounding a transaction.").

While the Court will focus on the overall factual allegations of the Committee's Amended Complaint, it is still helpful to conduct an examination of the individual factors.  The Committee cites five of these factors in their Amended Complaint to support recharacterization of the Secured Loan Agreements as equity.  (Am. Compl. ¶¶ 121-35.)  The Secured Lenders respond that the factors on which the Committee relies actually support

characterization of the Secured Loan Agreements as debt, thereby
warranting dismissal of the recharacterization claim.

        a.   <u>Fixed rate of interest</u>

    The Committee alleges in the Amended Complaint that the
Secured Loan Agreements provide a fluctuating rate of interest
"depend[ing] entirely upon changing LIBOR and/or the Wall Street
Journal's Prime Rate," rather than a fixed rate of interest.
(Am. Compl. ¶ 69.)

    The Secured Lenders respond that the Committee misinterprets
this factor.  According to the Secured Lenders, when an interest
rate fluctuates with market indices such as LIBOR or the prime
rate, it is considered a fixed rate of interest for purposes of
recharacterization.  <u>See, e.g.</u>, <u>AutoStyle</u>, 269 F.3d at 750-51
(holding that a loan with an interest rate based on a "prime
rate," although it may fluctuate, was a "fixed rate of interest"
for purposes of recharacterization analysis); <u>In re Franklin
Equip. Co.</u>, 416 B.R. 483, 496-97, 519 (Bankr. E.D. Va. 2009)
(holding that interest rate based on LIBOR index was a "fixed
interest rate" for purposes of recharacterization).

    When a transaction is intended as equity, there is usually
no interest paid or interest payments are sporadic because the
investor is more interested in seeing the value of its investment
grow rather than receiving periodic payments.  In reviewing this
factor, therefore, the Court considers whether the transaction is

structured as debt (with periodic repayment of interest at least) rather than equity (where repayment is deferred).  In this case the Amended Complaint alleges that interest was payable periodically at rates that (although fluctuating) are typical in the market place for debt instruments.  Therefore, the Court agrees with the Secured Lenders that the Committee's allegations that the Secured Loan Agreements do not provide a fixed rate of interest are insufficient to support a recharacterization claim.

b.    Adequate capitalization

In the Amended Complaint, the Committee acknowledges that in the Moll I Confirmation Order, the Texas Bankruptcy Court found that the Plan was feasible under section 1129(a)(11).  (Am. Compl. ¶ 61; D.I. # 12 at Ex. 4.)  The Court specifically stated that "[e]vidence presented by the Debtor demonstrates that the funds required by the Plan for consummation are available" and that "[c]onfirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization . . . ."  (D.I. # 12 at Ex. 4.)  After Confirmation, the Debtors and the Secured Lenders amended the Secured Loan Agreements in December 2004 (the "2004 Amendments").  It is those amendments on which the Committee relies to support its recharacterization claim.

As an initial matter, the Committee argues that the 2004 Amendments constituted a new loan agreement.  Therefore, the

14

Committee asserts that the 2004 Amendments severed the Secured
Loan Agreements from the Confirmation Order and any findings by
the Texas Bankruptcy Court, specifically that Moll was adequately
capitalized.  The focus of the Committee's Amended Complaint is
that "at the time the Senior Lenders entered into the 2004
[Amendments], neither HCMLP nor the Secured Lenders - upon
information and belief - intended to treat either obligation as
debt.  Instead, both HCMLP and the Secured Lenders truly intended
the 2004 [Amendments] to be equity."  (Am. Compl. ¶ 67.)

     Under this assumption, the Committee argues that the Secured
Lenders should have known at the time of the 2004 Amendments that
Moll did not have the ability to meet its obligations.  (Am.
Compl. ¶ 129.)  In support, the Committee asserts that from the
2004 Amendments until the petition date, the Secured Lenders
repeatedly forbore from exercising remedies, including but not
limited to, declaring Moll in default.  (Am. Compl. ¶¶ 109-10.)
The Committee specifically refers to one instance, after the
Debtors had sold three facilities, where the Senior Lenders did
not require the Debtors to pay down their senior loan in full
from the proceeds, but only required that the Debtors pay half of
the outstanding interest on their senior loan and apply $3.7
million towards their subordinated loan in exchange for a $20
million write-down.  (Am. Compl. ¶¶ 111-113.)  The Committee
asserts that this write-down evidences that the Secured Lenders

always intended that the Secured Loan Agreements be treated as
equity, "as no prudent lender would have permitted such a
reduction of secured debt."  (Am. Compl. ¶ 134.)

    According to the Secured Lenders, the Committee's assertion
that the 2004 Amendments severed the Secured Loan Agreements from
the original loan issued under the Moll I Plan is based on an
improper assumption.  Even if the 2004 Amendments are considered
a separate loan agreement, the Secured Lenders assert that this
factor does not support recharacterization because of the Senior
Lenders' pre-existing lender relationship.  See, e.g., SubMicron,
432 F.3d at 457 (noting that for pre-existing lenders,
"traditional factors that lenders consider (such as
capitalization, solvency, collateral, ability to pay cash
interest and debt ratios) do not apply as they would when lending
to a financially healthy company.").

    The Court agrees that the Senior Lenders' pre-existing
relationship limits the impact of this factor.  Id. at 456.  The
Committee's assertions that the Secured Lenders continually
failed to declare Moll in default, eased the terms of the Secured
Loan Agreements, and wrote down some of the debt, do not support
recharacterization.  In the case of a pre-existing lender, it is
legitimate for the lender to take actions to protect its existing
loans, including extending additional credit or granting
forbearance.  Radnor, 353 B.R. at 839.  The Committee's

16

allegations are actions typically taken by lenders seeking to
preserve their overall position.  <u>See</u> Sean Hagan, <u>Essay:</u>
<u>Restructuring Corporate Debt in the Context of a Systemic Crisis</u>,
73 Law & Contemp. Probs. 1, 5 (Fall 2010) (discussing instances
where banks write down the value of loans in an effort to "agree
to a level of debt reduction" necessary to "ensure the viability
of the corporation in question.").

Based on the foregoing, the Court finds that the Committee's
allegations of the Debtors' inadequate capitalization in 2004 are
insufficient to support their recharacterization of the secured
claim.

c.   <u>Security for the advances</u>

The Committee asserts that the Debtors' obligations under
the Secured Loan Agreements were dramatically under-secured at
the time of the 2004 Amendments.  In support, the Committee
alleges that within six weeks of the 2004 Amendments, "the
Debtors needed to borrow an additional $10 million just to meet
their obligations and keep the business running.  By September
2005, the Debtors had borrowed an additional $11 million."  (Am.
Compl. ¶ 83.)

The Secured Lenders respond that the actions taken in
connection with the 2004 Amendments are typical of their pre-
existing lender relationship and insufficient to support
recharacterization.  <u>SubMicron</u>, 432 F.3d at 456.

17

The Court agrees.  The Third Circuit in <u>SubMicron</u> held that debt should not be recharacterized simply because the pre-existing lenders extend additional loans to distressed borrowers, even where there is no additional collateral to support the new loans.  432 F.3d at 457.  <u>See also</u> <u>Radnor</u>, 353 B.R. at 839 (Bankr. D. Del. 2006) (stating that the lender's "knowledge that the Debtors were experiencing a liquidity crisis when the [loans] were made . . . is insufficient to support recharacterization" because "it [is] legitimate for an existing lender to extend additional credit to a distressed borrower as a means to protect its existing loans.").  Therefore, the Court concludes that this factor does not support recharacterization.

> d.   <u>Ability to obtain outside financing</u>

The Committee asserts that no prudent lender would have extended additional credit to the Debtors under the circumstances and that the Debtors had no alternative available source of credit.  In support, the Committee alleges that as of 2004, the Debtor's ratio of debt to equity was nearly 12.2.  (Am. Compl. ¶ 57.)  As a result, the Committee alleges that "there was no realistic possibility that the Debtors could have obtained alternative financing."  (Am. Compl. ¶ 75.)

The Secured Lenders respond that the 2004 Amendments did not grant Moll any additional credit but rather reduced Moll's additional indebtedness by $5.2 million.  In addition, the

18

Secured Lenders reiterate their previous argument that this factor is unpersuasive when a pre-existing lender lends to a borrower.  SubMicron, 432 F.3d at 457; Radnor, 353 B.R. at 839.

The Court agrees with the Secured Lenders.  The Committee's allegations are insufficient to state a claim for recharacterization because of the pre-existing lender relationship.  SubMicron, 432 F.3d at 457.  Existing lenders are often the only source of funding when a debtor faces distress. Therefore, inability to obtain alternative financing is insufficient to support recharacterization.

> e.    Sinking fund

Finally, the Committee alleges that the Secured Loan Agreements contain no sinking fund.  See, e.g., AutoStyle, 269 F.2d at 750.  The Secured Lenders respond that because the Texas Bankruptcy Court approved the Secured Loan Agreements without a sinking fund, its absence cannot support recharacterization.

Even without considering the Moll I Confirmation Order, the Court concludes that the Committee's allegations are insufficient to state a claim for recharacterization.  The Court should not apply a mechanistic approach to the AutoStyle factors, and the Court notes that the Committee's allegations only support one factor, the absence of a sinking fund.  In determining whether this factor alone supports a finding that the arrangement between the parties was equity not debt, however, the Court notes that

19

many debt arrangements do not have sinking funds.  <u>Indmar</u>
<u>Products Co., Inc. v. C.I.R.</u>, 444 F.3d 771, 783 (6th Cir. 2006)
(stating that the presence of a sinking fund can vary depending
on the whether the loan is secured or the company is well-
capitalized).

The Court also notes that many of the other factors not
addressed by the Committee actually support characterization of
the Secured Loan Agreements as debt, in particular the names
given to the instruments, the presence of a fixed maturity date,
the fact the loans were secured, and the lack of any explicit
subordination of the loans.  (D.I. #12 at Ex. 9-10.)  Based on
the overall factual allegations in the Committee's Amended
Complaint, the Court finds that the Committee has not stated a
sufficient claim for recharacterization.  Accordingly, the Court
will grant the Secured Lenders' motion to dismiss the Committee's
claim for recharacterization.

3.   <u>Equitable Subordination</u>

The Secured Lenders assert that the Committee has failed to
state a claim for equitable subordination.  Relying on a recent
Third Circuit decision, the Secured Lenders state that three
conditions "must be satisfied before exercise of the power of
equitable subordination is appropriate: (1) the claimant must
have engaged in some type of inequitable conduct; (2) the
misconduct must have resulted in injury to the creditors of the

bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." In re Winstar Commc'ns, Inc., 554 F.3d 382, 411 (3d Cir. 2009) (quotations and brackets omitted) (citing Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th Cir. 1977)).

The Committee asserts initially that inequitable conduct is not a requirement in the Third Circuit for equitable subordination. SubMicron, 432 F.3d at 462 (stating that the Third Circuit has "declined, however, to adopt the [inequitable conduct] element as a formal requirement for equitable subordination."); Miller v. McCown De Leeuw & Co., Inc., (In re The Brown Schs.), 368 B.R. 394, 411 (Bankr. D. Del. 2007) (noting that the Third Circuit has not adopted the inequitable conduct requirement, but finding nonetheless that the facts before the court stated claims of wrongdoing and injury to creditors.)

The Court concludes, however, that the decisions on which the Committee relies are no longer good precedent. Subsequent to the SubMicron decision, the Third Circuit has adopted inequitable conduct as a formal requirement for equitable subordination. Winstar, 544 F.3d at 411.

The Committee asserts nonetheless that it has alleged three instances of inequitable conduct. First, the Committee alleges that the Secured Lenders exercised control over the Debtors at

the expense of unsecured creditors by controlling and directing
all aspects of the Debtors' business.  In particular, the
Committee alleges that "[f]rom the time of Moll['s] emergence
from bankruptcy in 2003 through the end of 2004, HCMLP
continuously dominated and controlled the actions of Moll . . .
."  (Am. Compl. ¶ 78.)

Second, the Committee alleges that HCMLP directed the
Debtors to retain an advisory firm, Barrier Advisors Capital,
L.P. ("Barrier"), which is owned completely by one of the Secured
Lenders, NexBank.  (Am. Compl. ¶ 21.)  The Committee alleges that
Barrier was paid in excess of $1.9 million, but provided no
benefit to the Debtors.  (Am. Compl. ¶ 21.)

Finally, the Committee alleges that "HCMLP directed Moll . .
. to use some of [its] borrowed funds to purchase a facility
located in Tucson, Arizona (the 'Tucson Facility') . . . from
NexPak, a wholly owned subsidiary of HCMLP," and then caused the
Debtors to sell the facility within sixteen months of acquiring
it.  (Am. Compl. ¶¶ 83-86.)  It is not clear from the Committee's
Amended Complaint whether the facility was sold at a loss.  The
Committee alleges, however, that Moll was "only able to use some
of the proceeds from the ultimate sale of the Tucson Facility to
repay the money it had borrowed from the Secured Lenders to
originally purchase it."  (Am. Compl. ¶ 86.)

The Secured Lenders admit that use of a company as an alter ego can constitute inequitable conduct for purposes of equitable subordination.  See, e.g., Radnor, 353 B.R. at 841.  However, they note that the Committee has abandoned its alter ego claim against the Secured Lenders and is only asserting it against HCMLP.  Therefore, the Secured Lenders contend that the Committee no longer asserts that the Secured Lenders exercised sufficient control over Moll to constitute inequitable conduct.  In addition, the Secured Lenders contend that the Committee's claims that HCMLP controlled both the Secured Lenders and Moll is insufficient to establish the Secured Lenders' control over Moll's day-to-day operations.

The Secured Lenders similarly argue that the allegations regarding Barrier and the sale of the Tucson facility, focus solely on the actions of HCMLP, not the Secured Lenders. Finally, the Secured Lenders assert that the Amended Complaint fails to show that either transaction was inequitable or otherwise harmful to Moll's creditors.

The Court finds that the Committee's allegations are insufficient to sustain an equitable subordination claim against the Secured Lenders.  The allegations in the Amended Complaint fail to allege sufficient conduct by any of the Secured Lenders to control Moll, but rather it focuses solely on HCMLP.

23

Further, the Committee's Amended Complaint contains no allegations that the Secured Lenders were insiders of Moll; it only alleges that HCMLP was.  In re USDigital, Inc., 443 B.R. 22, 50 (Bankr. D. Del. 2011) (holding that the most important factor in determining inequitable conduct for equitable subordination purposes is whether the claimant was an insider at the time of the act).  The Court notes that HCMLP has not filed a claim in this case, so equitable subordination is not relevant as to it.

Based on the foregoing, the Court finds no basis for equitable subordination of the Secured Lenders claims and will grant the Secured Lenders' Motion as it relates to this count.

4.    Avoidance of Security Interest

The Secured Lenders assert that the Committee's attempt to avoid the Secured Lenders' security interest in a Moll bank account simply tracks the language of the Uniform Commercial Code.  According to the Secured Lenders, such a "formulaic recitation of the elements of a cause of action" fails to state a claim.  Iqbal, 129 S. Ct. at 1949.

The Committee responds that the Amended Complaint contains sufficient allegations of fact.  The Committee specifically refers to certain of the Debtors' deposit accounts maintained by Wells Fargo Bank, N.A. ("Wells Fargo").  (Am. Compl. ¶ 177.) According to the Amended Complaint, the Secured Lenders failed to perfect their security interest through "control" of the deposit

24

accounts and never entered into any control agreements whereby Wells Fargo agreed to the disposition of the funds in favor of the Secured Lenders.  (Am. Compl. ¶ 184.)  The remainder of the Amended Complaint recites the elements of perfection under Article 9 of the Uniform Commercial Code (the "UCC").

The Court finds that the Committee has made sufficient factual allegations to state a claim for avoidance of the security interest by alleging that the Secured Lenders had no control over the deposit account.  Therefore, the Court will deny the Secured Lenders' motion to dismiss the count for avoidance of the security interest.

        5.   Alter Ego Claim against HCMLP

"To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the companies 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'"  Off. Comm. of Unsecured Creditors v. Highland Capital Management, L.P. (In re Broadstripe, LLC), 09-50966, 2010 WL 3768003, at * 39 (Bankr. D. Del. Sept. 2, 2010) (citing Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990), aff'd, 932 F.3d 959 (3d Cir. 1991)).

As an initial matter, HCMLP asserts that the Committee must establish alter ego liability at all layers of subsidiaries ranging from HCMLP to Moll.  See In re The Heritage Org., L.L.C.,

25

413 B.R. 438, 514 (N.D. Tex. 2009) (stating that "[t]he Delaware two-prong test must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure."); Foxmeyer, 290 B.R. at 243-44 (same).  HCMLP asserts that it is not a shareholder of Moll or Moll's parent, Moll Holdings, but only has ownership interests in the shareholders of Moll Holdings.  According to HCMLP, the Amended Complaint fails to make any allegations of fraud or misuse of the corporate form by any of the intermediate owners.  Rather, the Committee only makes allegations regarding HCMLP and Moll, skipping all the middle layers.

       The Court concludes that it is not necessary for the Committee to make allegations sufficient to pierce every layer of the corporate structure between Moll and HCMLP.  There is no indication in the two-part test that it may only be applied to a direct relationship such as a parent and subsidiary.  Rather, the test requires that the companies operate as "a single economic entity," tied together by "an overall element of injustice." Broadstripe, 2010 WL 3768003, at * 39.

       In addition, the Court finds the Heritage case is distinguishable.  In Heritage, the trustee sought to apply the alter ego doctrine to the entire corporate structure, essentially collapsing it to include all of the entities as defendants.  413 B.R. at 514-15.  The Court in Heritage concluded that such a

26

collapse would make all of the entities liable for the one
subsidiary's liabilities and found that the defendant did not
offer sufficient evidence as to each corporation to support this
collapse.  Id. at 515.

     In contrast, here the Committee is only seeking to treat
Moll and HCMLP as one entity and is not seeking to hold any of
the intermediaries liable.  The Amended Complaint does not
require a global collapse of the corporate structure, but only
asserts that Moll and HCMLP themselves operated as a single
economic entity.

     Similarly, the Court finds HCMLP's interpretation of
Foxmeyer incorrect.  In Foxmeyer the trustee sought to pierce
only the corporate veil of a subsidiary and its direct parent but
did not wish to pierce the grandparent's corporate veil, in an
effort to preserve fraudulent conveyance claims.  290 B.R. at
243.  The Foxmeyer court found, however, that the party
responsible for and benefitting from the misuse of the corporate
form was the grandparent.  Id.  Therefore, the Court concluded
that the trustee had to include that relationship to assert a
viable alter-ego claim.  Id.  If the trustee wanted to leave out
the grandparent, the Court concluded that he had to establish a
specific "presence of fraud or similar injustice" between the
parent and subsidiary, which he had not.  Id.

27

Here, the alleged injustice allegation is based on the relationship between HCMLP and Moll.  Consequently, the Court finds that the Committee's failure to allege alter ego through all levels of the corporate structure does not warrant the claim's dismissal.  The Court will, therefore, conduct an analysis of the Committee's allegations under the two-part alter ego test.  Broadstripe, 2010 WL 3768003, at * 39.

a.    Single economic entity

In determining the first factor, courts consider the following factors: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."  Broadstripe, 2010 WL 3768003 at * 40.  While no single factor is dispositive, some combination is required.  Id.

i.    Undercapitalization or insolvency

Under the first factor, HCMLP argues that capitalization and solvency are only relevant "if such subsidiary was inadequately capitalized and/or insolvent from its inception or such adverse status was caused by acts of the subsidiary's parent."  Trevino v. Merscorp, 583 F. Supp. 2d 521, 529 (D. Del. 2008) (stating

28

that this factor is most relevant "for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business.").

According to HCMLP, the Committee has failed to allege that Moll was inadequately capitalized at its inception or that HCMLP caused the undercapitalization or insolvency.  HCMLP argues that the allegations that it relaxed loan covenants and did not insist on repayment of secured debt actually make it implausible that HCMLP could have caused Moll's undercapitalization or insolvency.

The Court agrees that the Committee has failed to state sufficient allegations that Moll was inadequately capitalized or insolvent at its inception.  As stated previously in discussing the recharacterization claim, all of the Committee's allegations regarding inadequate capitalization relate to the period beginning with the 2004 Amendments, not when the loans originated.  See supra Part C.2.b.  Further, the Committee alleges that at the time of the 2004 Amendments (and thereafter) various financial covenants and obligations were relaxed.  This would help (rather than hurt) Moll's financial condition.

In addition, the Court finds that the Committee has not made sufficient allegations that HCMLP caused Moll's inadequate capitalization and insolvency.  The Committee only alleges an increase in Moll's debt-to-equity ratio but does not make any

29

factual allegations to support a finding that this was caused by
any action of HCMLP.

### ii.  Corporate formalities

The Committee asserts that Moll failed to maintain corporate
formalities by not holding annual director and shareholder
meetings or maintaining separate offices, officers, and directors
from its holding company and HCMLP.

HCMLP responds that even if Moll did not hold board or
shareholder meetings, the parent of Moll, Moll Holdings, actually
did hold such meetings.  As a result HCMLP asserts that the
absence of meetings held by Moll is only relevant to piercing the
corporate veil between Moll and Moll Holdings.  HCMLP reiterates
its argument that in order for HCMLP to be held liable under an
alter ego theory, it must be shown that all of the entities in
the chain of ownership between HCMLP and Moll are alter egos and
did not follow corporate formalities.  As discussed previously,
the Court disagrees with HCMLP's assertion.

In addition, HCMLP argues that in order to show that the
corporations created a single enterprise, the Committee must show
more than sharing offices, officers, and directors.  Caccamo v.
Greenmarine Holdings LLC, 2002 WL 1466818, at *5 (N.D. Ill.
2002); Mason v. Network of Wilmington, 2005 WL 1653954, at *4
(Del. Ch. 2005).  According to HCMLP, the commingling of
directors and officers is consistent with the relationship
between a subsidiary and its parent company.  Id.

The Court finds that the Committee has sufficiently alleged that Moll failed to maintain certain corporate formalities.

### iii.  Payment of dividends

The Committee asserts that Moll never recognized or paid any dividends.  HCMLP did not dispute this allegation.  Therefore, the Court finds that the Committee has sufficiently alleged this factor.

### iv.  Corporate facade

The Committee argues that Moll was a mere facade, alleging that HCMLP controlled and directed every aspect of the Debtors' business strategies, financial matters, and operational issues. (Am. Compl. ¶¶ 150-51.)  Specifically, the Committee alleges that HCMLP directed the firing of Moll's CEO, the closing of a Tennessee plant, and the replacing of staff as well as the eventual closing of a Texas plant.  (Am. Compl. ¶¶ 98-99, 102-105, 150, 156.)

HCMLP asserts that to prove a corporation is merely a facade for the dominant stockholder, the Committee must provide facts alleging that the subsidiary company had no legitimate business operations and was merely a fraudulent corporation.  In re Sunstates Corp. Shareholder Litig., 788 A.2d 530, 534 (Del. Ch. 2001).  According to HCMLP, a corporation that is involved in substantial business operations is not considered a sham corporation.  Id.

31

HCMLP notes that the Amended Complaint actually concedes that HCMLP and Moll conducted fundamentally different businesses. (Am. Compl. ¶¶ 23-25) (stating that HCMLP is a hedge fund which establishes various other funds for investment purposes, while Moll is in the injection molding and manufacturing business). According to HCMLP, such a concession is fatal to any argument that Moll was a mere facade for HCMLP.  Foxmeyer, 290 B.R. at 244 (finding no facade when the subsidiary company operated a pharmaceutical distribution business and the parent conducted "several discrete albeit related healthcare businesses").

The Court agrees that the Committee's allegations are insufficient to allege that Moll was a mere facade for HCMLP. Moll and HCMLP were separate businesses, operating in completely different fields.  Therefore, the Court finds that the Committee has not sufficiently alleged this factor.

> v.    Siphoning funds

The Committee also asserts that HCMLP siphoned funds from Moll by directing Moll (a) to repay loans to the Secured Lenders, (b) to purchase the Tucson facility, and (c) to make payments to Barrier.

The Committee alleges that Moll paid more than $25 million to the Secured Lenders at the direction of HCMLP as loan repayments, when they "should have been recognized as returns on their equitable investments."  (Am. Compl. ¶ 159.)  HCMLP

32

responds that these allegations are so vague that they do not meet the pleading requirements of Iqbal and Twombly.

The Committee also asserts that HCMLP caused Moll to buy the Tucson plant from an HCMLP affiliate and then to sell it several months later. HCMLP responds that the Committee has failed to make any allegations that Moll actually lost money on the transaction. In addition, HCMLP asserts that when Moll purchased the Tucson Facility, it did so solely with funds furnished by HCMLP through the Secured Lenders. According to HCMLP, it would have no incentive to create a bogus transaction when it was footing the entire bill. Therefore, HCMLP asserts that the actual net result of this transaction was an increase in the money lent to Moll.

With regard to the payments to Barrier, the Committee alleges that Barrier received $1.9 million, for which Moll did not receive reasonably equivalent value. (Am. Compl. ¶ 89.) HCMLP responds that the Amended Complaint makes no attempt to describe what Barrier did (or did not do) during the course of its consulting with Moll. Rather, HCMLP asserts that the Committee only alleges that Moll did not receive reasonably equivalent value and that such allegations are simply a legal conclusion rather than a factual allegation. Feldman v. Chase Home Fin. (In re Image Masters, Inc.), 421 B.R. 164, 179-80 (Bankr. E.D. Pa. 2009) (holding that allegation that debtor

33

"received no value whatsoever in exchange for the Transfers alleged in this case - let alone reasonable equivalent value" was insufficient to survive a Rule 12(b)(6) motion).

The Court finds that the Committee has failed to make sufficient allegations that HCMLP was siphoning funds from Moll. The mere fact that Moll was making payments on its Secured Loan Agreements is not enough to meet this factor.  Cf., Trenwick Am. Litig. Trust v. Ernst & Young, 906 A.2d 168, 173 (Del. Ch. 2006) (holding that "[t]he mere fact that [a] holding corporation caused its wholly-owned subsidiary to take on more debt to support the holding corporation's overall business strategy does not buttress a[n alter ego] claim.").  In addition, the Court agrees with HCMLP that the Committee's allegations regarding the sale of the Tucson Facility and retention of Barrier only assert legal conclusions of inequitable conduct without sufficient supporting factual allegations.  Image Masters, 421 B.R. at 179-80.  The Committee does not allege that Moll lost money on the Tucson Facility, nor does it make any effort to describe the agreement with Barrier, beyond asserting that Moll did not receive reasonably equivalent value.

Based on the foregoing, the Court finds that the Committee has failed to make sufficient factual allegations that HCMLP and Moll operated as a single economic entity.  The only two factors that support the Committee are a failure to observe corporate

34

formalities and failure to pay a dividend.  As HCMLP had asserted
previously, allegations such as using the same office and sharing
officers and directors do not by themselves establish a single
enterprise.  In addition, the Court finds that a failure to pay a
dividend (especially in light of Moll's financial distress) is
not enough to state a claim that Moll and HCMLP were a single
economic enterprise.

> b.   Injustice or unfairness

As an initial matter, the Committee asserts that it need not
show that "the corporation must be a sham and exist for no other
purpose than as a vehicle for fraud." Wallace v. Cencom Cable
Income Partners II, L.P., 752 A.2d 1175, 1184 (Del. Ch. 1999).

The Court finds that the Committee is correct.  The second
prong of this test does not require allegations of fraud or a
sham corporation to pierce the corporate veil.  Foxmeyer, 290
B.R. at 236.  However, contrary to the Committee's assertion, the
court in Foxmeyer held that something like fraud must be proven
and stated the difference was "largely superficial." Id.
Further, the Committee must prove that reasonable reliance and
intent to deceive. Id. at 240-41.

The Committee asserts that it has sufficiently alleged
elements of injustice or unfairness by its allegations that HCMLP
controlled and dominated Moll.  Specifically, the Committee
alleges unfairness because: (1) HCMLP relaxed various financial

covenants and obligations on the Secured Loan Agreements in an effort to hide from unsuspecting unsecured creditors that anything was wrong with Moll; (2) HCMLP directed the purchase of the Tucson Facility and the retention of Barrier; and (3) HCMLP asserted such control while being able to assert a priority claim through its ownership of the Secured Lenders.

HCMLP responds to the first argument by asserting that relaxing loan covenants is not fraudulent.  According to HCMLP, the Amended Complaint is devoid of any allegations that unsecured creditors were ever mislead or reasonably believed that the Secured Lenders were not forbearing on declaring a default. Further, HCMLP asserts that the Committee admitted in the Amended Complaint that the failure of Moll was not caused by fraud, but by an "extremely risky program of rapid expansion and acquisition . . . [which] backfired when the Debtors' largest customer ended its business relationship with the Debtors."  (Am. Compl. ¶ 30.) The Court finds that the Committee's allegations that the Secured Lenders relaxed covenants and granted forbearance on the loan do not rise to the level of fraud.  As stated previously, it is common and legitimate for lenders to take actions to protect their existing loans, including extending additional credit or granting a forbearance.  Radnor, 353 B.R. at 839.

36

In response to the second argument, HCMLP asserts that both
the allegations regarding the Tucson Facility and the retention
of Barrier are not factual allegations, but rather legal
conclusions that need not be taken as true for the purposes of a
motion to dismiss.  <u>Image Masters</u>, 421 B.R. at 179-80.  As stated
previously, the Court agrees that the Committee's assertions on
these points are insufficient to support a finding of improper
conduct and merely state legal conclusions.

Finally, HCMLP responds to the third argument by asserting
that holding secured debt is not fraud.  HCMLP argues that the
Amended Complaint fails to make any allegations that "(a) any
creditor of Moll . . . was ever mislead about the existence of
secured debt; (b) any creditor of Moll . . . reasonably relied on
the nonexistence of secured debt, or that (c) HCMLP intended to
mislead any creditor of Moll . . . regarding the existence of
secured debt. . . ."  (D.I. # 36 at 8.)  The Court agrees with
HCMLP that the mere fact that HCMLP's affiliates held interests
in the Secured Loan Agreements is not enough to show injustice or
unfairness.

Therefore, the Court finds that the Committee has failed to
state a claim for alter ego against HCMLP.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the Secured Lenders' motion to dismiss the recharacterization claim and the equitable subordination claim.  The Court will deny the Secured Lenders' motion to dismiss the claim for avoidance of the security interest.  In addition, the Court will grant HCMLP's motion to dismiss the alter ego claim.

An appropriate Order is attached.

BY THE COURT:

Dated: August 3, 2011

Mary F. Walrath
United States Bankruptcy Judge